UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIHEIM MARTIN, <br><br> Plaintiff, <br><br> -against- <br><br> CITY OF SYRACUSE, COUNTY OF ONONDAGA, DETECTIVE JEFFREY BLAUVELT, DETECTIVE LINDSAY MCCORMACK, DETECTIVE JACOB BREEN, DETECTIVE PAUL MONTALTO, DETECTIVE JOSEPH HEIDER, DETECTIVE THOMAS LUND, CRIME ANALYST SARAH PIERCE, AND SYRACUSE POLICE DEPARTMENT OFFICERS AND DETECTIVES JOHN/JANE DOE #1-10 (names and numbers of whom are unknown at present), <br><br> Defendants. | **Case No:** 5:26-cv-1219 (ECC/MJK) <br><br> **COMPLAINT** <br><br> **PLAINTIFF DEMANDS A TRIAL BY JURY** |

**The Plaintiff, NIHEIM MARTIN, by his attorneys, Roth & Roth, LLP, complaining of the Defendants herein, alleges and states as follows:**

## PRELIMINARY STATEMENT

1.       This is a civil action seeking monetary damages for Plaintiff NIHEIM MARTIN due to the violation of his rights under the United States Constitution arising from his two false arrests and malicious prosecutions for Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree by City of Syracuse Police Department DETECTIVE JEFFREY BLAUVELT, DETECTIVE LINDSAY MCCORMACK, DETECTIVE JACOB BREEN, DETECTIVE PAUL MONTALTO, DETECTIVE JOSEPH HEIDER, DETECTIVE THOMAS LUND, CRIME ANALYST SARAH PIERCE, AND OFFICERS AND DETECTIVES JOHN/JANE DOE #1-10 ("Defendant Officers"), and against the County of Onondaga for the second indictment and re-prosecution of Mr. Martin based on several unlawful policies of the

1

County implemented by District Attorney William J. Fitzpatrick, the final policymaker for the Onondaga County District Attorney's Office, including the failure to maintain any administrative policy requiring supervisory review or case-review procedures before ADAs could seek re-indictment following a judicial dismissal for legal insufficiency, and Fitzpatrick's decision, as final policymaker, to re-prosecute Mr. Martin on charges previously dismissed as legally insufficient without any new evidence curing the identified deficiencies.

2.      This case stems from Mr. Martin's two false arrests and malicious prosecutions for the murder of Joshua Williams. On April 21, 2022, at approximately 8:40 p.m. Williams was fatally shot in the head in front of 132 Hudson Street in the City of Syracuse, New York. Williams was standing on the street with his friend, Jazheir Daye, when a suspected blue Subaru Crosstrek drove past. Daye drew a handgun and fired multiple shots at the passing vehicle. During this exchange, Daye's gunfire inadvertently struck Williams in the head, killing him. It is undisputed that Daye fired the fatal shot that killed Williams.

3.      Shortly after the Hudson Street shooting, Plaintiff Niheim Martin arrived at Upstate University Hospital via a private vehicle, a Chevrolet Impala driven by his friend Quejawon Cook. Mr. Martin had suffered from a gunshot wound to his buttocks sustained in an entirely unrelated incident in a different part of the city.

4.      Defendant Detective Jeffrey Blauvelt and members of the Syracuse Police Department ("SPD") Homicide Unit theorized that shots were fired toward Mr. Williams from the blue Subaru Crosstrek. Defendant Officers identified Mr. Martin as a suspect, alleging that he was a front seat passenger in the blue Subaru Crosstrek and that he exchanged gunfire with individuals on the street. Mr. Martin was identified as a suspect based solely on the fact that he arrived at

2

Upstate University Hospital with a gunshot wound shortly after Mr. Williams was fatally shot by his friend Mr. Daye on Hudson Street.

5.    However, the physical forensic evidence collected by Defendant Officers during their fifteen-month investigation directly contradicted their theory that Mr. Martin was present in the blue Subaru Crosstrek and simultaneously omitted material exculpatory evidence. For example, no blood was found in the suspected blue Subaru Crosstrek. Blood was, however, found in the Chevrolet Impala that Mr. Martin's friend, Quejawon Cook, used to drive him to the hospital.

6.    Despite the complete absence of evidence connecting Mr. Martin to the Hudson Street shooting, and despite physical forensic evidence that directly contradicted their theory, Defendant Officers fabricated official paperwork and reports claiming, *inter alia*, that it "was determined" that Mr. Martin's gunshot injury occurred during the Hudson Street shooting, and that Mr. Martin was in the suspected blue Subaru Crosstrek, seated in the front passenger seat, and had fired a weapon out the window, which they forwarded to the District Attorney's Office to initiate and continue Mr. Martin's malicious prosecutions. These false and misleading materials were prepared and submitted prior to any grand jury presentation and formed the basis upon which the prosecutor relied in seeking indictments against Mr. Martin.

7.    Plaintiff was first arrested on July 20, 2023, nearly fifteen months after the incident, and charged with Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. Defendant Detective Blauvelt signed a Felony Complaint falsely swearing that Mr. Martin "acted in concert with other subjects, to intentionally fire gunshots... [and] was observed on multiple COPS platform cameras," despite knowing no camera footage identified Mr.

3

Martin inside the Subaru, at the location of the shooting, or holding a gun. Plaintiff was arraigned on Indictment No. 2023-0495-1 on September 8, 2023.

8.      On April 10, 2024, Onondaga County Court Judge Mary Anne Doherty dismissed both charges, finding the evidence legally insufficient. The Court held that "there was no direct evidence that Defendant was ever in the suspect vehicle, let alone at the time of the shooting, and, even if Mr. Martin was in the vehicle at the time of the shooting, there was no evidence, direct or circumstantial, that established Mr. Martin had the requisite intention to commit murder in the second degree." The Court granted the People leave to re-present the matter to another grand jury — that is, leave to present legally sufficient evidence, not to re-package the same evidence the Court had just found insufficient.

9.      Following the dismissal, Defendant Officers did not accept the Court's determination. Instead, they conspired to re-arrest Mr. Martin by claiming to have uncovered "new evidence" that was, in reality, merely a re-packaging of known, prejudicial information regarding alleged gang affiliations that did not address the forensic deficiencies identified by the Court. Defendant Blauvelt and Crime Analyst Sarah Pierce prepared materials for, provided them to the District Attorney for use in, and personally testified at the second grand jury presentation, which was conducted on May 8 and 10, 2024, and which classified Mr. Martin as a member of the "Bricktown" gang and the victim as a member of the "110" gang to manufacture a motive and "intent" that the physical evidence did not support. Ultimately, the Defendants re-presented the same flimsy case to the grand jury. The second indictment was issued in the name of District Attorney William J. Fitzpatrick who, upon information and belief, personally authorized the re-presentation.

10.     On June 6, 2024, relying on these fabricated materials prepared and submitted by Defendant Officers, Mr. Martin was re-arrested and arraigned on Indictment No. 2024-0340-1. On November 1, 2024, Judge Doherty issued a Decision/Order granting the defense's motion to dismiss the second indictment, holding that the evidence remained legally insufficient, holding that "Even if we were to assume for the sake of argument the evidence was sufficient to place Defendant at the scene of the crime, the only evidence that allegedly establishes Defendant's conscious objective to cause the death of Joshua Williams is that they were members of different gangs."

11.     The People appealed the dismissal to the Appellate Division, Fourth Department. On March 20, 2026, the Fourth Department unanimously affirmed the trial court's dismissal, *People v. Martin*, No. KA 24-01865 (4th Dep't Mar. 20, 2026). The court held that the People "did not adduce legally sufficient evidence before the grand jury to sustain an indictment on the crimes." *Id.* The court identified two independent deficiencies. First, the evidence was insufficient to place defendant in the vehicle: a police officer testified only that video showed "consistencies with something sticking out of the passenger side of that vehicle," but never testified that this "something" was a person, gun, or defendant. *Id.* Second, even assuming arguendo that defendant was present, the People failed to prove that defendant shared the perpetrator's intent to kill. The court held that "[t]here can be no 'community of purpose' where, as here, the evidence establishes that defendant and the perpetrator were members of opposing gangs." *Id.* Accomplice liability requires that the aider and abettor "share the intent or purpose of the principal actor," and gang membership of opposing groups cannot satisfy this requirement. *Id.* (citing *People v. La Belle*, 18 N.Y.2d 405, 412 (1966)).

12.     As a result of Defendant Officers' two false arrests and malicious prosecutions, Mr. Martin spent a combined total of approximately fifteen months in jail. Following his first arrest on July 20, 2023, Mr. Martin remained incarcerated until on or about May 2, 2024—nearly ten months—when, following Judge Doherty's dismissal of the charges, he was released to electronic home confinement under federal supervision. Following his second arrest on June 6, 2024, Mr. Martin was again incarcerated until November 21, 2024—more than five additional months— awaiting trial on the same baseless charges that had already been deemed legally insufficient. During these periods of wrongful incarceration, Plaintiff lost his job as a truck-unloader at Upstate Farms, lost income, and suffered severe mental and emotional distress.

13.     Defendants' conduct violated Mr. Martin's rights under the Fourth and Fourteenth Amendments to the United States Constitution and gives rise to claims under 42 U.S.C. § 1983. Defendants' conduct also gives rise to claims under New York law: Mr. Martin asserts claims for malicious prosecution under New York common law and for the deprivation of liberty without due process of law in violation of Article I, § 6 of the New York State Constitution, against the Defendant Officers and against the City of Syracuse, which is liable for the tortious conduct of its employees committed within the scope of their employment under the doctrine of respondeat superior. Mr. Martin seeks compensatory and punitive damages, in an amount to be determined by a jury, as well as reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## II.    **PARTIES**

14.     Plaintiff NIHEIM MARTIN is a resident of the City of Syracuse, County of Onondaga, State of New York.

15. Defendant CITY OF SYRACUSE ("CITY") is a municipal entity created and authorized under the laws of the State of New York and is a resident of the Northern District of New York.

16. Defendant CITY is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the Syracuse Police Department ("SPD").

17. At all relevant times, Defendant COUNTY OF ONONDAGA ("Onondaga County" or "the County") was and is a municipal corporation, organized and existing under and by virtue of the laws of the State of New York.

18. The Onondaga County District Attorney's Office ("the OCDAO") was and is an agency and/or subdivision of the County.

19. The Onondaga County District Attorney—who at all relevant times was William J. Fitzpatrick ("Fitzpatrick" or "D.A. Fitzpatrick")—and Assistant District Attorneys of Onondaga County ("ADAs" or "prosecutors") were and are agents and/or employees of the County.

20. At all relevant times, ADA Robert E. Moran ("Moran") was employed as the Chief Assistant District Attorney at the OCDAO. Moran prosecuted both indictments against Mr. Martin and personally presented the case to the second grand jury on May 8 and 10, 2024.

21. At all relevant times, the ADA(s) involved in violating Plaintiff's civil and constitutional rights, including Moran, and all individuals who acted in concert with said ADA(s) in doing so, were acting under color of the statutes, ordinances, customs, and usage of the State of

New York, County of Onondaga, and within the course and scope of their employment for the OCDAO.

22.    At all relevant times, D.A. Fitzpatrick, as the District Attorney of Onondaga County, was responsible for, and the chief architect of, all policies, practices, and customs of the D.A.'s office. In that capacity, D.A. Fitzpatrick was the final policymaker for Onondaga County with respect to the administration, management, training, supervision, and discipline of ADAs in Onondaga County, and was responsible for the appointment, training, supervision, discipline, and conduct of each and every ADA who worked in his office. In particular, D.A. Fitzpatrick was the final policymaker for Onondaga County with respect to administrative policies governing whether ADAs would be subject to supervisory review, mandatory case-review protocols, or disciplinary procedures when seeking to re-present criminal charges to a grand jury after a court had dismissed an indictment for legal insufficiency.

23.    Upon information and belief, D.A. Fitzpatrick made the ultimate decision to reindict and prosecute Mr. Martin a second time, after reviewing the alleged "new evidence" discovered by the Defendant Syracuse Police Department officers and detectives, and after the case was presented to him for a second indictment by ADAs in his office, including ADA Moran, despite knowing there was no additional or new evidence connecting him to the crime.

24.    Upon information and belief, D.A. Fitzpatrick made the decision to re-indict and prosecute Mr. Martin a second time in his official capacity as the District Attorney of Onondaga County. As the County's final policymaker for the District Attorney's Office, Fitzpatrick's decision to pursue a second indictment against Mr. Martin—despite the absence of any new evidence curing the legal insufficiencies identified by Judge Doherty—constituted an official policy of Onondaga County. *See Pembaur v. Cincinnati*, 475 U.S. 469, 480–81 (1986) (a single

8

decision by a final policymaker may constitute municipal policy); *Rivas v. Onondaga County*, 2025 WL 2675826, at *17–*19 (N.D.N.Y. Sept. 18, 2025) (County admitted Fitzpatrick was final policymaker; his conduct attributed to the County under *Monell*). This decision reflected a de facto County policy of permitting the re-prosecution of defendants on charges previously dismissed for legal insufficiency, even in the absence of new evidence curing the identified deficiencies.

25.     Separate and apart from any prosecutorial charging decision, D.A. Fitzpatrick, acting in his administrative and managerial capacity on behalf of Onondaga County, made a deliberate choice not to require any supervisory review, written approval, or documented case-review procedure before ADAs in his office could seek a second indictment following a judicial determination that a prior indictment was legally insufficient. D.A. Fitzpatrick's failure to implement any such administrative safeguard was a policy decision made in his capacity as the County's final policymaker for the administration and supervision of the OCDAO, not in his capacity as an advocate exercising prosecutorial discretion in any individual case.

26.     The County of Onondaga has admitted in prior litigation before this Court that D.A. Fitzpatrick was "the final policymaker" for the District Attorney's Office. *See Rivas v. Onondaga County*, No. 5:19-cv-00844, 2025 WL 2675826, at *17, *19 (N.D.N.Y. Sept. 18, 2025) (Sannes, C.J.). As a final policymaker, D.A. Fitzpatrick's decisions regarding the administration and management of the OCDAO—including decisions concerning the supervision, review, discipline, and case-management practices of ADAs—constituted the official policy of Onondaga County for purposes of 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under binding Second Circuit precedent, "the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception being the decision of whether, and on what charges, to prosecute." *Anilao v. Spota*, 27 F.4th 855,

874 (2d Cir. 2022). The claims asserted herein against Onondaga County do not fall within that narrow exception; they concern the administration of the District Attorney's office, not any individual charging decision.

27.    Defendant Detective JEFFREY BLAUVELT ("Blauvelt") was at all relevant times an officer and detective employed by SPD. Blauvelt was the lead investigator who, prior to any grand jury presentation, prepared a 173-slide PowerPoint and other official documentation containing false and misleading information and material omissions of exculpatory evidence. Blauvelt forwarded these materials to the District Attorney, who relied on them to initiate and continue the malicious prosecution of Mr. Martin. The materials mischaracterized surveillance footage, fabricated a narrative implicating Mr. Martin without evidentiary support, and deliberately omitted plainly exculpatory evidence including the forensic evidence establishing Mr. Martin was not in the suspect vehicle. Blauvelt was also the arresting officer and signed the Felony Complaint falsely swearing to facts he knew were unsupported by the evidence. He is sued in his individual and official capacities.

28.    Defendant Detective LINDSAY MCCORMACK ("McCormack") was at all relevant times an officer and detective employed by SPD. McCormack processed the blue Subaru Crosstrek on April 22, 2022, discovered a bullet hole in the passenger door, and recovered a projectile lodged inside the door panel that never penetrated the interior of the vehicle. McCormack also documented the absence of any blood evidence inside the Subaru, despite the Defendant Officers' theory that a front-seat passenger had been shot in the buttocks. McCormack knew or should have known that these forensic findings directly contradicted the SPD's and the prosecution's theory and failed to ensure this exculpatory evidence was properly disclosed in the

10

materials provided to the District Attorney prior to grand jury presentations. She is sued in her individual and official capacities.

29.     Defendant Detective JACOB BREEN ("Breen") was at all relevant times an officer and detective employed by SPD. On April 22, 2022, Breen, along with Detective Paul Montalto, located the suspect vehicle, a blue Subaru Crosstrek, at 504 W. Brighton Ave. Breen participated in the investigation that gathered exculpatory evidence which was subsequently omitted from the materials provided to the District Attorney prior to grand jury presentations. He is sued in his individual and official capacities.

30.     Defendant Detective PAUL MONTALTO ("Montalto") was at all relevant times an officer and detective employed by SPD. On April 22, 2022, Montalto, along with Detective Breen, located the suspect vehicle at 504 W. Brighton Ave. Montalto participated in the investigation that gathered exculpatory evidence which was subsequently omitted from the materials provided to the District Attorney prior to grand jury presentations. He is sued in his individual and official capacities.

31.     Defendant Detective JOSEPH HEIDER ("Heider") was at all relevant times an officer and detective employed by SPD. On April 21, 2022, Heider interviewed Mr. Martin at Upstate Hospital, where Mr. Martin stated he was not at Hudson Street but was shot by an unknown person while walking near the Woodhaven Apartments/Western Lights Plaza. This alibi statement was consistent with the forensic evidence but was not properly disclosed in the materials provided to the District Attorney prior to grand jury presentations. He is sued in his individual and official capacities.

11

32.     Defendant Detective THOMAS LUND ("Lund") was at all relevant times an officer and detective employed by SPD. On April 28, 2022, Lund, along with Detective Blauvelt, went to Mr. Martin's home and conducted a canvass of the Merrell Road/Western Lights area, ostensibly to verify Mr. Martin's account of where he was shot. After a perfunctory investigation, they reported finding no evidence of a shooting to discredit Mr. Martin's account, while intentionally ignoring that the forensic evidence (blood in the Impala, lack of blood in the Subaru) corroborated Mr. Martin's account that he was not in the suspect vehicle during the homicide. He is sued in his individual and official capacities.

33.     Defendant Crime Analyst SARAH PIERCE ("Pierce") was at all relevant times a crime analyst at the Central New York Crime Analysis Center (formerly the Onondaga Crime Analysis Center), where she supervised gang-classification determinations under the SPD's gang-member policy, which she helped author, and she is presently employed by the SPD. Pierce, along with Detective Blauvelt, prepared materials regarding alleged gang affiliations that were provided to the District Attorney prior to the second grand jury presentation, and on May 8, 2024, Pierce testified before the second grand jury that Mr. Martin was a "Bricktown" gang member and that the decedent and the shooter, Jazheir Daye, were "110" gang members. These materials and this testimony were used to manufacture a motive and "intent" that the physical evidence did not support, and did not cure the evidentiary deficiencies that led to dismissal of the first indictment. She is sued in her individual and official capacities.

34.     Defendants BLAUVELT, MCCORMACK, BREEN, MONTALTO, HEIDER, LUND, PIERCE, AND OFFICERS AND DETECTIVES JOHN/JANE DOE #1-10 are collectively referred to as "Defendant SPD Officers". At all times relevant herein, the individual Defendant SPD Officers were acting under color of state law in the course and scope of their duties

12

and functions as agents, servants, employees, and officers of the Defendant CITY, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the SPD at all times relevant herein, with the power and authority vested in them as officers, detectives, agents, and employees of the SPD and incidental to the lawful pursuit of their duties as officers, detectives, employees, and agents of the SPD and the CITY.

35.    The individual Defendant Officers' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard for Plaintiff's rights.

36.    At all relevant times, the individual Defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence in support and the authority of their offices to one another.

III.  **JURISDICTION AND VENUE**

37.    This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1988.  This Court has supplemental jurisdiction over Plaintiff's claims arising under New York law and the New York State Constitution pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

38.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Northern District of New York, the judicial district where the claims arose and in which the Defendants conduct business.

39. Mr. Martin timely served Notices of Claim upon the City in compliance with General Municipal Law § 50-e.

40. More than thirty (30) days have elapsed since service of said Notices of Claim, and the City has failed to pay or adjust the claims.

41. This action was brought within a year and 90 days of the event that gives rise to Mr. Martin's causes of action under New York State law and Plaintiff has complied with all of the statutory prerequisites for bringing this action.

IV. **STATEMENT OF FACTS**

42. On April 21, 2022, gunfire erupted on the 100 block of Hudson Street in Syracuse. Joshua Williams was fatally shot in the head. Surveillance footage later showed that Williams and his friend Jazheir Daye were standing on the street when a blue Subaru Crosstrek drove by them. Daye drew a handgun and fired multiple shots at the passing vehicle. During this exchange, Daye's gunfire inadvertently struck Williams in the head, fatally wounding him; Mr. Williams succumbed to his injuries at Upstate University Hospital on April 26, 2022. It is undisputed that Daye fired the fatal shot.

43. At the time of the Hudson Street shooting, Mr. Martin was nowhere near Hudson Street. He was in an entirely different part of the city, near the Woodhaven Apartments/Western Lights Plaza, when an unknown assailant shot him in the buttocks. After being shot, Mr. Martin called his friend Quejawon Cook, who picked him up near the Woodhaven apartments and drove him to Upstate University Medical Center for emergency treatment.

14

44.     Defendant Officers immediately identified Mr. Martin as a suspect, based solely on the fact that he arrived at Upstate University Medical Center for emergency treatment shortly after Joshua Williams was fatally shot.

45.     The Defendant Officers theorized that Mr. Martin was a front seat passenger in the blue Subaru Crosstrek and that he exchanged gunfire with individuals on the street. However, the physical forensic evidence collected by Defendant Officers during their investigation directly contradicted this theory.

46.     All evidence pointed only to Daye, who was identified by both camera footage and eyewitnesses as being one of the shooters on Hudson Street. After reviewing the camera footage from a neighboring house, Defendant Officers describe the video as showing Daye repeatedly firing his handgun and the person standing next to him, Mr. Williams falling to the ground shortly thereafter.

47.     On April 22, 2022, Defendant Detectives Jacob Breen and Paul Montalto located the suspect vehicle, a blue Subaru Crosstrek, at 504 W. Brighton Ave.

48.     Defendant Detective Lindsay McCormack processed the suspect blue Subaru Crosstrek and documented two separate bullet impacts to the vehicle. The first was a bullet hole in the lower front passenger door; the projectile was found lodged inside the door panel itself and never penetrated the interior of the vehicle. The second was a bullet hole through the rear passenger-side wheel well; that projectile did enter the interior of the vehicle. However, the trajectory analysis Defendant Officers themselves performed and documented established that the path of the wheel-well round passed by the center console and did not traverse the area where the front passenger seat was located. The forensic significance of these findings is decisive. Defendant

15

Officers' theory was that Mr. Martin was seated in the front passenger seat of the Subaru and was struck in the right buttock by incoming gunfire from outside the vehicle. Neither bullet that struck the Subaru could have caused that injury: the front-passenger-door round never entered the vehicle, and the wheel-well round followed a trajectory that did not pass through the front passenger seating area. The physical and forensic evidence Defendant Officers themselves collected, photographed, and presented to the grand jury thus affirmatively excluded Mr. Martin's placement in the front passenger seat of the suspect vehicle as the source of his gunshot wound.

49.    Furthermore, despite Mr. Martin suffering a bleeding gunshot wound to his buttocks that required hospital treatment, Defendant McCormack and the Crime Scene Unit found no blood evidence inside the blue Subaru Crosstrek to place Mr. Martin in that vehicle. This absence of blood was inconsistent with the SPD and the prosecution's theory that a front-seat passenger had been struck by return fire.

50.    In stark contrast, blood evidence was observed in the Chevrolet Impala driven by Quejawon Cook--the vehicle that actually transported Mr. Martin to the hospital. Mr. Martin's hospital records and contemporaneous photographs show that Cook's vehicle had blood on the seats, consistent with Mr. Martin's wound.

51.    Despite this exculpatory forensic evidence proving Mr. Martin bled in the Impala—not the Subaru—Defendant Officers suppressed this contradiction in the materials they prepared and provided to the District Attorney's Office prior to grand jury presentations, and instead used the fabricated and incomplete materials to manufacture probable cause against Mr. Martin — falsely asserting in official documentation, from the first days of the investigation, that it "was determined" that Mr. Martin's gunshot injury occurred during the Hudson Street shooting, and

treating as established thereafter that Mr. Martin had been the front-seat passenger in the suspect blue Subaru Crosstrek.

52.     On April 21, 2022, Defendant Detective Joseph Heider interviewed Mr. Martin at Upstate Hospital. Mr. Martin stated he was not at Hudson Street but was shot by an unknown person while walking near the Woodhaven Apartments/Western Lights Plaza. Mr. Martin cooperated fully with officers, answered their questions, and provided them with his phone number for further questioning if needed.

53.     Mr. Martin's driver, Quejawon Cook, corroborated that he picked Mr. Martin up at an apartment complex near the Woodhaven Apartments/Western Lights area — on the other side of the city from the scene of the shooting — and drove him to Upstate University Hospital.

54.     The Western Lights canvass did not occur until April 28, 2022 — a full week after the homicide, and a week after Mr. Martin had been treated at Upstate University Hospital for a gunshot wound to the right buttock. The canvass did not uncover affirmative evidence corroborating Mr. Martin's and Mr. Cook's accounts of the shooting. Whatever the canvass did or did not corroborate as to the precise location from which Mr. Martin was shot, it is undisputed that Mr. Martin was in fact shot that evening: he was treated for a gunshot wound at Upstate University Hospital within the hour, and Defendant Officers themselves documented his injury, his blood-stained clothing, and the blood in the Impala that brought him to the hospital.

55.     Defendants represented in their reports and in the materials forwarded to the District Attorney that the Western Lights canvass had affirmatively discredited Mr. Martin's alibi. That characterization was knowingly or recklessly misleading. The canvass did not disprove that Mr. Martin had been shot in the Western Lights area; it established only that the precise location

and identity of the female contact Mr. Martin had attempted to meet could not be conclusively corroborated through the specific cameras, tenant lists, and witnesses that Defendants identified seven days after the shooting. Defendants nonetheless treated the absence of corroboration as affirmative disproof and forwarded the canvass to the District Attorney as part of the materials used to support Mr. Martin's prosecution.

56. By the time Defendants effected Mr. Martin's first arrest on July 20, 2023 — fifteen months after the homicide of Joshua Williams — their investigation had produced no evidence sufficient to establish probable cause. Over those fifteen months, Defendants and other members of the Syracuse Police Department Homicide Unit conducted an extensive camera canvass; collected and reviewed dozens of hours of private, commercial, and "COPS platform" surveillance footage from locations throughout the City of Syracuse; obtained and executed multiple search warrants for residences, vehicles, and electronic accounts; conducted cell-tower and phone-record analyses; and reviewed social media platforms including Facebook, YouTube, and Snapchat. At no point during those fifteen months did Defendants obtain (a) any video footage placing Mr. Martin inside, exiting from, or in possession of the suspect blue Subaru Crosstrek alleged to be the homicide vehicle; (b) any video or other evidence of Mr. Martin firing a weapon, possessing a weapon, or being present at 132 Hudson Street at the time of the shooting; (c) any eyewitness identification of Mr. Martin as a passenger in the Subaru, as one of the shooters, or as having been at the Hudson Street scene; or (d) any physical or forensic evidence — fingerprints, DNA, blood, ballistics, gunshot residue, or otherwise — connecting Mr. Martin to the Subaru, to any of the casings or projectiles recovered, or to any weapon used in the homicide.

57. What Defendants did obtain was video footage placing Mr. Martin behind the wheel of his mother's silver Nissan Murano at other locations within the City of Syracuse during the

hours preceding the homicide — footage that placed Mr. Martin in an entirely different vehicle from the suspect Subaru and that did not place him at or near 132 Hudson Street at the time of the shooting. The fifteen-month investigation, in short, never crossed the threshold from suspicion to probable cause. Notwithstanding the absence of probable cause, Defendant Officers compiled the investigation into the materials they forwarded to the District Attorney for grand jury presentation — and ultimately into the 173-slide PowerPoint presented to the second grand jury on May 8, 2024 — strung together to depict hours of Mr. Martin's lawful daily activity in a way calculated to mislead the District Attorney and the grand jurors into mistaking association and proximity for proof.

58.    This documentation, prepared by Defendant Detective Blauvelt and other Defendant Officers prior to the grand jury presentation, contained false and fabricated information and/or material omissions of plainly exculpatory facts. Specifically, the materials: (a) Failed to disclose or minimized the blood evidence placing Mr. Martin in his friend Quejawon Cook's Chevrolet Impala rather than the suspect Subaru; (b) Failed to disclose or minimized the bullet-wound trajectory evidence establishing that the projectile lodged in the Subaru's passenger door never penetrated the interior and could not have struck a passenger seated inside; (c) Failed to fairly present Mr. Martin's contemporaneous alibi statement and the forensic evidence corroborating it; (d) In the Felony Complaint sworn by Defendant Blauvelt, asserted that Mr. Martin "acted in concert with other subjects, to intentionally fire gunshots toward a group of individuals including the victim," without disclosing that the fatal shot was fired by Jazheir Daye — the victim's own friend and fellow gang member, whom the SPD itself had identified as the shooter and who was later arrested for that shooting — thereby obscuring the exculpatory

significance of that fact; and (e) Mischaracterized surveillance footage that did not in fact identify Mr. Martin as present in the Subaru or as possessing or firing a weapon.

59.     Defendant Blauvelt signed a Felony Complaint falsely swearing that Mr. Martin "acted in concert with other subjects, to intentionally fire gunshots... [and] was observed on multiple COPS platform cameras," despite knowing no camera footage identified Mr. Martin inside the Subaru, at the crime scene, or holding a gun.

60.     The District Attorney relied on these false, fabricated, and materially incomplete materials--which were prepared and submitted by Defendant Officers prior to any grand jury presentation--to seek and obtain an indictment against Mr. Martin.

61.     On July 20, 2023, nearly fifteen months after the incident, Plaintiff was arrested and charged with Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. Plaintiff's arrest was effected by Defendant Blauvelt and was based entirely on the materially false and misleading information contained in the paperwork and documentation that Defendant Officers had prepared and forwarded to the District Attorney's Office in support of the Felony Complaint.

62.     Plaintiff was arraigned on Indictment No. 2023-0495-1 on September 8, 2023.

63.     On April 10, 2024, Judge Mary Anne Doherty of the Onondaga County Court dismissed the indictment, finding that the evidence presented to the grand jury was legally insufficient. The court noted that there was "no direct evidence that [Mr. Martin] was ever in the suspect vehicle" and "no evidence, direct or circumstantial, that established Mr. Martin had the requisite intention to commit murder in the second degree".

64.     Mr. Martin nevertheless remained in custody until May 2, 2024, due to a federal probation hold, causing him to spend nearly ten months incarcerated for a crime he did not commit.

65.     Despite the Court's explicit determination that there was no evidence connecting Mr. Martin to Mr. William's death, Defendants maliciously sought to resurrect the case. They conspired to re-arrest Mr. Martin by fabricating "new evidence" to attempt to cure the legal deficiencies identified by the Court.

66.     Defendant Officers claimed to have uncovered additional information connecting Mr. Martin to the shooting. In reality, this "new evidence" was merely a re-packaging of known, prejudicial information regarding alleged gang affiliations that did not address the forensic deficiencies that led to dismissal in the first place.

67.     Prior to May 8 and 10, 2024, Defendant Blauvelt and Crime Analyst Sarah Pierce prepared materials for the District Attorney regarding the second grand jury. Prior to any grand jury presentation, Defendants provided materials classifying Mr. Martin as a member of the "Bricktown" gang and the victim as a member of the "110" gang to manufacture a motive and "intent" that the physical evidence did not support. On May 8, 2024, Pierce testified before the second grand jury, classifying Mr. Martin, Quejawon Cook, and a third man as "Bricktown" gang members, and the decedent and Jazheir Daye as "110" gang members, as of April 2022.

68.     Defendant Officers knew that this "new" gang narrative was not evidence that Mr. Martin was in the suspect vehicle, that he possessed a weapon or fired shots on April 21, 2022, or that he had any intent to commit murder; yet they prepared and provided these materials to the District Attorney that were used to maliciously initiate a second prosecution.

21

69. On June 6, 2024, relying on the fabricated "new" theory and the materials prepared and provided by Defendant Officers, Mr. Martin was re-arrested and arraigned on Indictment No. 2024-0340-1. Defendants knew or should have known there was no new or additional proof, yet they again charged Mr. Martin with Murder in the Second Degree and Possession of a Weapon in the Second.

70. Plaintiff's defense counsel moved to dismiss the second indictment, arguing that the "new" proof was legally irrelevant and that the People still could not prove Mr. Martin was in the car, possessed a gun, fired a weapon, or had any intent to commit murder.

71. On November 6, 2024, Judge Mary Anne Doherty announced in open court her decision granting Mr. Martin's motion to dismiss the second indictment. Judge Doherty provided the parties with her written Decision and Order, dated November 1, 2024, which held that the evidence remained legally insufficient, holding that "[e]ven if we were to assume for the sake of argument the evidence was sufficient to place Defendant at the scene of the crime, the only evidence that allegedly establishes [Mr. Martin's] conscious objective to cause the death of Joshua Williams is that they were members of different gangs."

72. The People appealed the dismissal to the Appellate Division, Fourth Department. On March 20, 2026, the Fourth Department unanimously affirmed the trial court's dismissal of the second indictment, finding that the People "did not adduce legally sufficient evidence before the grand jury to sustain an indictment on the crimes" and that the evidence was "legally insufficient to establish that defendant was in the Crosstrek or that he possessed a loaded firearm." *People v. Martin*, No. KA 24-01865 (4th Dep't Mar. 20, 2026). The proceedings concluded in Mr. Martin's favor on March 20, 2026, when the Appellate Division affirmed the dismissal.

22

73.    Mr. Martin remained detained from June 6, 2024, until November 21, 2024.

74.    As a direct and proximate result of Defendants' acts and omissions, Mr. Martin suffered loss of liberty, lost wages, emotional distress, mental anguish, humiliation, reputational harm and other damages. He was jailed for approximately fifteen months in total, lost his job, and continues to suffer psychological harm.

**OCDAO's Failure to Supervise, Review, and Discipline Following Dismissal**

75.    At the time of Plaintiff's re-indictment, upon information and belief, the OCDAO lacked any written or unwritten policy, protocol, or required supervisory procedure governing the re-presentation of criminal charges to a grand jury after a court had dismissed a prior indictment for legal insufficiency under CPL § 210.20. On information and belief, the OCDAO maintained no standard operating procedure, checklist, or internal guideline requiring any form of independent review or supervisory approval before an ADA could seek a second indictment on a case that had been judicially dismissed.

76.    On information and belief, the ADAs involved in seeking Mr. Martin's second indictment, including ADA Moran, were not required to: (a) obtain written approval from a bureau chief, division chief, or any supervisory ADA before re-presenting the case to a grand jury; (b) submit a written memorandum or analysis addressing the specific evidentiary deficiencies identified by Judge Doherty in her April 10, 2024 dismissal order; (c) certify in writing that new evidence had been identified that cured the legal insufficiencies previously found by the Court; or (d) conduct or document an independent evaluation of whether the prior defects had been remedied before seeking a second indictment.

23

77.    Despite two judicial determinations—both by the same judge—finding the evidence legally insufficient to sustain the charges against Mr. Martin, the OCDAO conducted no internal investigation, imposed no discipline, initiated no retraining, and took no corrective or remedial action whatsoever with respect to the ADAs involved in seeking Plaintiff's re-indictment. On information and belief, the OCDAO did not conduct any internal review of the circumstances surrounding the first dismissal before authorizing the second grand jury presentation, nor did it conduct any review following the second dismissal.

78.    The risk that ADAs would pursue a second indictment unsupported by legally sufficient evidence was patently obvious and highly predictable where the OCDAO maintained no supervisory review, mandatory case-review protocol, or discipline mechanism governing re-indictment after a judicial dismissal for legal insufficiency. This risk was especially foreseeable in the context of a Murder in the Second Degree charge—a Class A-I felony carrying the most severe consequences under New York law—where a court had already made a specific finding that the evidence was legally insufficient, and where the same judge would preside over the second indictment. The absence of any administrative safeguard made it a virtual certainty that an ADA could and would seek a second indictment without meaningfully addressing the deficiencies identified by the Court.

79.    On information and belief, D.A. Fitzpatrick made a deliberate choice not to implement any formal policy, protocol, or supervisory procedure governing the re-presentation of charges after a judicial dismissal for legal insufficiency. As the final policymaker for the OCDAO, this choice constituted the official policy of Onondaga County. *See Pembaur v. Cincinnati*, 475 U.S. 469, 480–81 (1986) (municipalities may be held liable for "a single decision by a municipal policymaker" where the decisionmaker "possesses final authority to establish municipal policy

24

with respect to the action ordered"). D.A. Fitzpatrick's deliberate decision not to require supervisory review or case-review protocols for post-dismissal re-indictment—like his admitted failure in other litigation to maintain formal disclosure policies for his office—reflected a pattern of administrative neglect that became, by operation of law, the official policy of Onondaga County. *See Rivas v. Onondaga County*, 2025 WL 2675826, at \*18 (N.D.N.Y. Sept. 18, 2025) (holding that the County was liable under *Monell* where Fitzpatrick, as final policymaker, failed to implement adequate disclosure policies and his personal practices became the office's policy).

80.    Had Onondaga County, through D.A. Fitzpatrick, maintained even minimal administrative supervisory safeguards—such as a mandatory review of the prior dismissal order, a requirement that new evidence be identified and documented in writing, or a supervisory sign-off before re-presentation to a grand jury—Plaintiff would not have been re-arrested on June 6, 2024, and would not have been incarcerated for an additional five months on charges that were again found to be legally insufficient. The constitutional injuries suffered by Mr. Martin during his second arrest and prosecution flowed directly from the absence of any such administrative supervision, not from the exercise of prosecutorial discretion in any individual case.

## V.   CLAIMS FOR RELIEF

### a.   CLAIMS AGAINST THE DEFENDANT OFFICERS AND CITY OF SYRACUSE

**<u>FIRST CLAIM FOR RELIEF</u>**

**FALSE ARREST (FIRST ARREST – JULY 20, 2023) UNDER 42 U.S.C. § 1983**

**(AGAINST THE DEFENDANT OFFICERS)**

25

81.    All preceding and subsequent paragraphs are incorporated by reference.

82.    Defendant Officers caused Plaintiff to be arrested without probable cause and in violation of his clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

83.    The Defendant Officers obtained and reviewed camera footage from the neighboring yard that depicted the shooting; the footage clearly showed Daye repeatedly firing a handgun and Mr. Williams falling to the ground shortly thereafter.

84.    Mr. Martin, despite the fact that he was in the hospital, being treated for his own and completely unrelated bullet wound, voluntarily spoke to officers, answered their questions, affirmatively provided his alibi, and provided them with his phone number for further questioning if needed.

85.    The physical forensic evidence collected by Defendant Officers during their investigation independently corroborated Mr. Martin's account and contradicted the theory that he had been a passenger in the blue Subaru Crosstrek. No blood was found anywhere inside the blue Subaru, despite Defendant Officers' theory that a front-seat passenger had been shot in the buttocks during the exchange of gunfire. By contrast, blood was found in the Chevrolet Impala driven by Mr. Martin's friend Quejawon Cook — the vehicle in which Mr. Martin arrived at Upstate University Hospital — consistent with Mr. Martin's account that he was shot in an entirely separate incident and transported to the hospital by Cook. Defendant Officers knew or should have known that this forensic evidence directly undermined their theory and corroborated Mr. Martin's alibi, yet they disregarded both the forensic evidence and Mr. Martin's alibi in their entirety.

86.     Despite having this exculpatory information—including video evidence that excluded Mr. Martin and showed Daye firing the handgun—the Defendant Officers nevertheless falsely arrested Mr. Martin on July 20, 2023.

87.     No reasonable police officer could have believed that probable cause existed to arrest Mr. Martin given that Defendants: (a) blatantly ignored the fact that Mr. Martin was shot at a completely different location than Mr. Williams; (b) omitted or concealed that Mr. Martin's blood, from his gunshot wound, was found in his friend's car who drove him to the hospital whereas no blood was found in the suspect vehicle; (c) disregarded the video footage showing Daye firing his handgun and Mr. Williams falling to the ground immediately thereafter; (d) knowingly or recklessly omitted and/or misrepresented statements from eyewitnesses; (e) deliberately ignored, concealed, or misrepresented Mr. Martin's alibi statements; and (f) falsely suggested in police reports and supporting documents that probable cause existed despite the overwhelming exculpatory evidence and complete lack of evidence tying Mr. Martin to Mr. Williams's death.

88.     Mr. Martin was arrested on July 20, 2023 by Defendant Blauvelt, who that same day swore out a Felony Complaint charging Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. The arrest lacked probable cause because Defendant Officers acted on knowingly false information and deliberately disregarded material exculpatory facts — including the absence of blood inside the Subaru, the presence of blood inside the Chevrolet Impala consistent with Mr. Martin's account, the lack of any eyewitness identification placing Mr. Martin in the suspect vehicle, the video showing Daye firing the handgun, and Mr. Martin's contemporaneous alibi. No reasonable officer in possession of the truth would have concluded that probable cause existed. *See Manuel v. City of Joliet*, 580 U.S. 357, 364–67 (2017); *Weyant v. Okst*,

101 F.3d 845, 852 (2d Cir. 1996); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–80 (2d Cir. 2016).

89.    Mr. Martin was conscious of his confinement and did not consent to it. The criminal case against Mr. Martin was pursued with actual and total malice and in the absence of probable cause.

90.    Mr. Martin's arrest was made in the absence of probable cause, and any process relied upon to effect or continue his detention was procured through materially false and misleading information.

91.    By these actions, Defendants deprived Mr. Martin of his right to be free from unreasonable seizures in violation of the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

92.    As a direct and proximate result of Defendants' actions, Plaintiff was wrongly arrested, prosecuted, suffered the loss of his liberty and reputation, lost his job and housing, and endured emotional distress and other damages as set forth above.

93.    *Defendant Officers'* actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CLAIM FOR RELIEF

### FALSE ARREST (SECOND ARREST – JUNE 6, 2024) UNDER 42 U.S.C. § 1983

### (AGAINST THE DEFENDANT OFFICERS)

94.    All preceding and subsequent paragraphs are incorporated by reference.

95.    On or about May 10, 2024, the Onondaga County Grand Jury returned Indictment No. 2024-0340-1. On June 6, 2024, Mr. Martin appeared for arraignment on that indictment, was

28

arraigned, and — at the People's request — was re-arrested, taken into custody, and detained pursuant to the securing order entered on the indictment.

96. Defendant Officers caused Mr. Martin's June 6, 2024 re-arrest through their fabrication and suppression that procured Indictment No. 2024-0340-1, on which his remand and detention were ordered. Defendants' conduct was the proximate cause of that seizure regardless of which officials physically effected it.

97. Although an indictment ordinarily creates a presumption of probable cause for the resulting arrest, that presumption is rebutted where the indictment was procured by fraud, perjury, fabrication of evidence, the suppression of exculpatory evidence by the police, or other police bad faith. *See Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010); *Rothstein v. Carriere*, 373 F.3d 275, 282–83 (2d Cir. 2004); *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).

98. Defendant Officers procured the second indictment through precisely such misconduct. Prior to the second grand jury presentation, they prepared and provided to the District Attorney a 173-slide PowerPoint and supporting materials manufacturing a "gang affiliation" motive unsupported by the physical or forensic evidence, which had not been part of the first prosecution and which did not address, much less cure, the evidentiary deficiencies that led Justice Doherty to dismiss the first indictment for legal insufficiency on April 10, 2024.

99. In their presentation to the second grand jury, Defendant Officers continued to suppress or distort material exculpatory evidence, including: (a) the absence of any blood evidence inside the blue Subaru Crosstrek; (b) the presence of blood inside the Chevrolet Impala consistent with Mr. Martin's account; (c) Mr. Martin's contemporaneous alibi taken at Upstate Medical Center on April 21, 2022, which was presented only as discredited and without the forensic

evidence corroborating it; and (d) the absence of any eyewitness identification placing Mr. Martin in the suspect vehicle.

100.    Defendant Blauvelt testified before the second grand jury on May 8, 2024 and gave false and misleading testimony designed to manufacture probable cause that the physical evidence did not support.

101.    Had the grand jury been given the suppressed exculpatory evidence and not been misled by the fabricated gang-affiliation theory, no reasonable grand jury could have found probable cause to indict — as Justice Doherty confirmed when she dismissed the second indictment on November 1, 2024 for the same evidentiary insufficiencies that infected the first, and as the Fourth Department unanimously affirmed on March 20, 2026. *People v. Martin*, No. KA 24-01865 (4th Dep't Mar. 20, 2026).

102.    Defendants' fabrication of evidence and suppression of exculpatory evidence vitiated any probable cause flowing from the indictment and the securing order and detention premised on it. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–80 (2d Cir. 2016); *Zahrey v. Coffey*, 221 F.3d 342, 348–55 (2d Cir. 2000).

103.    Mr. Martin was conscious of his confinement, did not consent to it, and was detained from June 6, 2024 until November 21, 2024.

104.    As a direct and proximate result of Defendants' conduct, Mr. Martin lost his liberty, lost his job and housing, and suffered emotional distress and other damages.

105.    Defendant Officers acted willfully, maliciously, oppressively, and/or recklessly, warranting punitive damages.

30

**THIRD CLAIM FOR RELIEF**

**MALICIOUS PROSECUTION**

**(FIRST PROSECUTION INDICTMENT NO. 2023-0495-1) UNDER 42 U.S.C. § 1983**

**(AGAINST THE DEFENDANT OFFICERS)**

106.    All preceding and subsequent paragraphs are incorporated by reference.

107.    Defendant Officers, acting individually and in concert, initiated and continued the prosecution of Plaintiff despite knowing that probable cause did not exist.

108.    Prior to any grand jury presentation, Defendant Officers prepared false and misleading materials and forwarded them to the District Attorney's Office in to initiate Plaintiff's prosecution.

109.    Defendants knew or acted in reckless disregard for the truth in pursuing the prosecution. They ignored or deliberately withheld exculpatory evidence that would have demonstrated Mr. Martin's innocence and failed to conduct any meaningful investigation into alternative suspects.

110.    On April 10, 2024, the criminal proceedings terminated without a conviction and in the Plaintiff's favor when the charges were dismissed by the court for legal insufficiency.

111.    As a direct and proximate result of Defendants' actions, Plaintiff was wrongly prosecuted for nearly 10 months, suffered the loss of his liberty and reputation, lost his job and housing, and endured emotional distress and other damages as set forth above.

112.    Defendant Officers' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

**FOURTH CLAIM FOR RELIEF**

**MALICIOUS PROSECUTION**

**(SECOND PROSECUTION INDICTMENT NO. 2024-0340-1) UNDER 42 U.S.C. § 1983**

**(AGAINST THE DEFENDANT OFFICERS)**

113.    All preceding and subsequent paragraphs are incorporated by reference.

114.    Defendant Officers, acting individually and in concert, resurrected and continued the prosecution of Plaintiff despite knowing that there was no new evidence and that probable cause did not exist.

115.    Prior to any grand jury presentation, Defendant Officers prepared false and misleading materials and forwarded them to the District Attorney's Office to initiate Plaintiff's reindictment and second prosecution. The District Attorney relied on these false materials to initiate and continue the malicious prosecution of Mr. Martin.

116.    Defendants knew or acted in reckless disregard for the truth in pursuing the prosecution. They ignored or deliberately withheld exculpatory evidence that would have demonstrated Mr. Martin's innocence and failed to conduct any meaningful investigation into alternative suspects.

117.    On November 1, 2024, the trial court issued a Decision and Order dismissing the second indictment for legal insufficiency. The People appealed the dismissal to the Appellate Division, Fourth Department. On March 20, 2026, the Fourth Department unanimously affirmed the dismissal, and the criminal proceedings terminated without a conviction and in the Plaintiff's favor. People v. Martin, No. KA 24-01865 (4th Dep't Mar. 20, 2026).

118.    As a direct and proximate result of Defendants' actions, Plaintiff was wrongly prosecuted for nearly 6 months, suffered the loss of his liberty and reputation, lost his job and housing, and endured emotional distress and other damages as set forth above.

119.    Defendant Officers' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

**FIFTH CLAIM FOR RELIEF**

**DENIAL OF FAIR TRIAL (FIRST PROSECUTION) – FABRICATION OF EVIDENCE UNDER 42 U.S.C. § 1983**

**(AGAINST THE DEFENDANT OFFICERS)**

120.    All preceding and subsequent paragraphs are incorporated by reference.

121.    Defendant Officers, acting individually and in concert, fabricated evidence and created false and misleading documentation that they provided to the District Attorney prior to the first grand jury presentation, knowing this evidence was false or misleading.

122.    The fabricated evidence and false documentation included: (a) a PowerPoint presentation prepared and narrated by Defendant Blauvelt that mischaracterized surveillance footage and omitted exculpatory evidence; (b) official paperwork and reports that falsely stated probable cause existed; (c) the Felony Complaint signed by Defendant Blauvelt falsely swearing that Mr. Martin was observed on camera footage when in fact no such footage placed Mr. Martin in the suspect vehicle or at the scene of the shooting; and (d) the omission and mischaracterization of material exculpatory evidence.

33

123. Defendant Officers knew at the time they prepared and provided these materials to the District Attorney prior to grand jury presentations that the materials contained false information and/or material omissions of exculpatory evidence.

124. As a direct and proximate result of Defendants' judicial deception and deliberate concealment of exculpatory evidence in materials provided to the District Attorney prior to the first grand jury presentation, Mr. Martin was arrested without probable cause on July 20, 2023, and prosecuted for nearly 10 months until the charges were dismissed in their entirety on April 10, 2024.

125. Defendant Officers' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

## SIXTH CLAIM FOR RELIEF

## DENIAL OF FAIR TRIAL (SECOND PROSECUTION) – FABRICATION OF EVIDENCE UNDER 42 U.S.C. § 1983

## (AGAINST THE DEFENDANT OFFICERS)

126. All preceding and subsequent paragraphs are incorporated by reference.

127. Defendant Officers, acting individually and in concert, fabricated evidence and created false and misleading documentation that they provided to the District Attorney prior to grand jury presentations, knowing this evidence was false or misleading.

128. The fabricated evidence and false documentation included: (a) police paperwork falsely claiming that it had been "determined" that Mr. Martin was inside of the suspect vehicle; (b) a 173-slide PowerPoint, narrated and interpreted by Defendant Blauvelt, that mischaracterized surveillance footage, improperly used "gang affiliation" evidence to manufacture motive and intent

that the physical evidence did not support, and omitted material exculpatory evidence; (c) the gang-affiliation materials Defendant Pierce prepared and provided to the District Attorney for use before the second grand jury, and Pierce's May 8, 2024 grand jury testimony classifying Mr. Martin as a "Bricktown" gang member and the decedent and the shooter as "110" gang members; (d) Defendant Blauvelt's false and misleading testimony before the second grand jury on May 8, 2024; and (e) the continued omission and mischaracterization of material exculpatory evidence — including the absence of any blood inside the Subaru, the presence of blood inside the Chevrolet Impala consistent with Mr. Martin's account, and Mr. Martin's contemporaneous alibi.

129.    Defendant Officers knew at the time they prepared and provided these materials to the District Attorney prior to the second grand jury presentation that the materials contained false information and/or material omissions of exculpatory evidence.

130.    As a direct and proximate result of Defendants' judicial deception and deliberate concealment of exculpatory evidence in materials provided to the District Attorney prior to grand jury presentations, Mr. Martin was arrested again without probable cause on June 6, 2024, and prosecuted until the charges were, once again, dismissed in their entirety. On November 1, 2024, the trial court dismissed the second indictment for legal insufficiency. The People appealed, and on March 20, 2026, the Appellate Division, Fourth Department, unanimously affirmed the dismissal. People v. Martin, No. KA 24-01865 (4th Dep't Mar. 20, 2026).

131.    Defendant Officers' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

**SEVENTH CLAIM FOR RELIEF**

**FAILURE TO INTERVENE (FIRST ARREST/PROSECUTION)**

**UNDER 42 U.S.C. § 1983**

35

**(AGAINST THE DEFENDANT OFFICERS)**

132.    All preceding and subsequent paragraphs are incorporated by reference.

133.    At all relevant times, Defendant Officers were present during Detective Blauvelt's and other Defendant Officers' misconduct and failed to intervene to stop or prevent the violation of Mr. Martin's rights during the first investigation, warrant application process, arrest, and prosecution.

134.    Defendant Officers were aware that fellow officers and detectives were violating Mr. Martin's constitutional rights during the first arrest and prosecution but failed to intervene.

135.    Each of the individual defendants had an affirmative duty and a realistic opportunity to intervene to prevent the unlawful arrest, prosecution, and prolonged deprivation of liberty that Mr. Martin suffered.

136.    Despite having ample opportunity to do so, none of the individual defendants intervened to prevent the fabrication and concealment of material facts, the applications for an arrest warrant despite knowing probable cause was lacking, or the forwarding of false and misleading evidence to prosecutors.

137.    As a result of their failure to intervene, Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated.

138.    Defendants' conduct was willful, malicious, reckless, and/or showed a deliberate indifference to Mr. Martin's constitutional rights, and punitive damages should be imposed.

**EIGHTH CLAIM FOR RELIEF**

**FAILURE TO INTERVENE (SECOND ARREST/PROSECUTION)**

**UNDER 42 U.S.C. § 1983**

36

**(AGAINST THE DEFENDANT OFFICERS)**

139.    All preceding and subsequent paragraphs are incorporated by reference.

140.    At all relevant times, Defendant Officers were present during Detective Blauvelt's and other Defendant Officers' misconduct and failed to intervene to stop or prevent the violation of Mr. Martin's rights during the second investigation, warrant application process, arrest, and prosecution.

141.    Defendant Officers were aware that fellow officers and detectives were violating Mr. Martin's constitutional rights during the first arrest and prosecution but failed to intervene.

142.    Each of the individual defendants had an affirmative duty and a realistic opportunity to intervene to prevent the second unlawful arrest, prosecution, and prolonged deprivation of liberty that Mr. Martin suffered.

143.    Despite having ample opportunity to do so, none of the individual defendants intervened to prevent the fabrication and concealment of material facts, the application for an arrest warrant despite knowing that probable cause was lacking, or the forwarding of false and misleading evidence to prosecutors.

144.    As a result of their failure to intervene, Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated.

145.    Defendants' conduct was willful, malicious, reckless, and/or showed a deliberate indifference to Mr. Martin's constitutional rights, and punitive damages should be imposed.

**NINTH CLAIM FOR RELIEF**

**MUNICIPAL LIABILITY UNDER MONELL**

**42 U.S.C. § 1983**

**(AGAINST THE CITY OF SYRACUSE)**

146.    All preceding paragraphs are incorporated herein by reference.

147.    On information and belief, the City of Syracuse maintained policies, customs, and practices that were the moving force behind the constitutional violations described above, including but not limited to: (a) inadequate training and supervision of SPD detectives and officers concerning (i) obligations to disclose exculpatory and impeachment material to prosecutors prior to grand jury presentations, (ii) the preparation and submission of materials to prosecutors (including the use of extended PowerPoint presentations and annotated slide shows), and (iii) the proper collection and analysis of forensic and medical/location evidence; (b) deficient protocols and supervisory review for materials prepared and submitted to prosecutors prior to grand jury presentations that permitted Detective Blauvelt's 173-slide PowerPoint--which omitted material exculpatory facts--to be provided to the District Attorney without adequate supervisory review or correction; and (c) a custom or practice of failing to discipline detectives who knowingly or recklessly omit material exculpatory evidence from official submissions to prosecutors and judicial authorities.

148.    On information and belief, these policies and customs constitute deliberate indifference to constitutional rights, and they were the moving force behind the deprivation of Plaintiff's rights.

149.    Plaintiff therefore asserts *Monell* liability against the City for the constitutional injuries described herein.

   b.    **CLAIMS AGAINST THE DEFENDANT COUNTY OF ONONDAGA**

**TENTH CLAIM FOR RELIEF**

**MUNICIPAL LIABILITY UNDER MONELL — FAILURE TO SUPERVISE, REVIEW,**

38

## DISCIPLINE, AND TRAIN

## (AGAINST THE COUNTY OF ONONDAGA)

## 42 U.S.C. § 1983

150.    All preceding paragraphs are incorporated herein by reference.

151.    This claim does not seek to impose liability on Onondaga County for the exercise of prosecutorial discretion in this individual case. Rather, Plaintiff asserts that Onondaga County is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for its failure to implement administrative policies governing the supervision, review, and discipline of ADAs in connection with post-dismissal case review and re-indictment decisions.

152.    The County is liable under the single-incident liability theory recognized in *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) for the reindictment and prosecution of Mr. Martin.

153.    D.A. Fitzpatrick was the final policymaker for Onondaga County with respect to administrative policies governing the supervision, review, and discipline of ADAs within the OCDAO. *See Walker v. City of New York*, 974 F.2d 293, 297–99 (2d Cir. 1992) (distinguishing between a district attorney's prosecutorial functions, in which the DA acts as a state officer, and the DA's administrative functions of training, supervising, and disciplining subordinate attorneys, in which the DA acts as a county policymaker). In making the deliberate choice not to implement any supervisory review, case-review protocol, or disciplinary mechanism governing post-dismissal re-indictment, D.A. Fitzpatrick acted in his administrative capacity as a county policymaker, not as a state advocate exercising prosecutorial discretion.

154.    On information and belief, at the time of Plaintiff's re-indictment, the OCDAO maintained no policy, protocol, or procedure requiring: (a) supervisory review or written approval before an ADA could re-present a dismissed indictment to a grand jury; (b) independent evaluation

39

of whether the specific evidentiary deficiencies identified by the dismissing court had been cured; (c) documentation of any new evidence sufficient to overcome a CPL § 210.20 dismissal; or (d) any form of post-dismissal case review by a supervisor, bureau chief, or independent evaluator. The OCDAO's total absence of any such administrative safeguards constituted a deliberate policy choice by the County's final policymaker.

155.    The OCDAO further failed to train its ADAs on the constitutional, statutory, and ethical requirements governing the re-presentation of charges to a second grand jury following a dismissal for legal insufficiency under CPL § 210.20. The OCDAO provided no training on: (a) the requirement that any re-presentation cure the specific evidentiary deficiencies identified by the dismissing court with new and qualitatively different evidence, rather than merely re-package the previously dismissed evidence under a new theory; (b) the standards for evaluating whether purported new evidence in fact addresses a prior insufficiency finding; (c) the prosecutor's continuing duty to disclose material exculpatory evidence to the second grand jury and to refrain from re-presentation premised on suppression of the same exculpatory evidence the dismissing court found unaddressed; and (d) the constitutional and ethical limits on the use of character or "gang affiliation" evidence to manufacture motive or intent that the physical and forensic evidence does not support. Re-presentation following a CPL § 210.20 dismissal for legal insufficiency is a recurring situation the County's final policymaker, D.A. Fitzpatrick, knew to a moral certainty his ADAs would confront. The obvious likelihood that, absent training, ADAs would mishandle re-presentation — and would, as Defendants did here, simply re-package the same insufficient evidence with a fabricated motive theory — was so apparent that the OCDAO's complete failure to provide such training constitutes deliberate indifference to the constitutional rights of individuals subject to re-prosecution. *See City of Canton v. Harris*, 489 U.S. 378, 388–90 (1989);

*Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992); *Connick v. Thompson*, 563 U.S. 51, 63–64 (2011).

156.    Despite two judicial determinations by the same judge that the evidence against Mr. Martin was legally insufficient, the OCDAO imposed no discipline, initiated no retraining, and took no corrective action with respect to the ADAs who sought Plaintiff's re-indictment on legally insufficient evidence. The County's failure to discipline or retrain these ADAs, even after repeated judicial findings of evidentiary insufficiency, constituted deliberate indifference to the known risk that ADAs would continue to seek baseless re-indictments absent any supervisory check.

157.    The need for supervisory safeguards governing post-dismissal re-indictment was so obvious, and the inadequacy of the County's existing practices so likely to result in the violation of constitutional rights, that the County's failure to act constituted deliberate indifference to the rights of persons such as Plaintiff. *See City of Canton*, 489 U.S. at 390 (single-incident liability may be established where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"). In this case, the obvious risk of a constitutional violation was the re-indictment and prolonged incarceration of a Mr. Martin on charges a court had already found legally insufficient—a risk inherent in any system that permits ADAs to seek re-indictment without any form of supervisory review or accountability.

158.    In the alternative, and independently, Onondaga County is liable under the *Pembaur* single-decision final-policymaker theory. D.A. Fitzpatrick, as the County's admitted final policymaker for the administration of the OCDAO, made the deliberate decision not to implement any supervisory review, case-review, or disciplinary protocol governing the re-presentation of charges following a judicial dismissal for legal insufficiency. That single

41

administrative decision—which was not an exercise of prosecutorial discretion in any individual case, but rather a managerial choice about how the office would operate—constituted the official policy of Onondaga County. *Pembaur v. Cincinnati*, 475 U.S. 469, 480–84 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008). As established in *Rivas v. Onondaga County*, 2025 WL 2675826, at *17–*19 (N.D.N.Y. Sept. 18, 2025)—a case brought against the same defendant County and the same District Attorney in this same Court—the County admitted that Fitzpatrick was the final policymaker for the DA's office, and the Court held that the County was liable under *Monell* where Fitzpatrick's administrative practices (and the absence of formal office protocols) constituted the County's official policy. The same analysis applies here: Fitzpatrick's failure to implement any post-dismissal case-review procedures was a deliberate administrative policy choice by the County's final policymaker, and that policy was the moving force behind the deprivation of Plaintiff's constitutional rights.

159.    This Court has recognized that the Second Circuit "has ascribed a district attorney's conduct to a municipality, rather than the state, in cases involving a prosecutor's office failing to adequately train its prosecutors" and in matters related to "the administration of the district attorney's office." *Rivas*, 2025 WL 2675826, at *18 (quoting *Bellamy v. City of New York*, 914 F.3d 727, 758 (2d Cir. 2019)). The failure to implement post-dismissal supervisory review is an administrative function squarely within this recognized category. In this claim, Plaintiff does not seek to impose liability on Onondaga County for the narrow prosecutorial decision of whether or on what charges to prosecute; Plaintiff seeks to hold the County accountable for the complete absence of any administrative mechanism to prevent the re-prosecution of individuals on charges a court has already found legally insufficient.

160.    The County's deliberate failure to supervise, review, and discipline ADAs in connection with post-dismissal case review and re-indictment was the moving force behind the deprivation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution. Had the County maintained even minimal administrative safeguards, Plaintiff's second false arrest, malicious prosecution, and five-month incarceration on legally insufficient charges would not have occurred.

161.    Plaintiff therefore asserts *Monell* liability against Onondaga County for the constitutional injuries described herein, and seeks compensatory damages and such other relief as the Court deems just and proper.

## ELEVENTH CLAIM FOR RELIEF

## MUNICIPAL LIABILITY UNDER MONELL — SINGLE-DECISION FINAL POLICYMAKER AND ADMINISTRATIVE AUTHORIZATION OF RE-INDICTMENT

## (AGAINST THE COUNTY OF ONONDAGA)

## 42 U.S.C. § 1983

162.    All preceding paragraphs are incorporated herein by reference.

163.    In addition to, and independent of, the failure-to-supervise theory set forth in the Tenth Claim for Relief, Onondaga County is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because D.A. Fitzpatrick's decision to authorize and pursue the re-indictment and re-prosecution of Mr. Martin a second time—despite the absence of any new evidence curing the legal insufficiencies identified by the Court—constituted an official administrative policy of Onondaga County attributable to it under 42 U.S.C. § 1983. This claim does not seek to impose liability on the County for the abstract prosecutorial discretion to charge or decline to charge any individual; rather, it targets Fitzpatrick's exercise of his administrative final policymaking

43

authority over the operation and management of the OCDAO, including the absence of any office-level written approval, supervisory review, or documented case-review requirement governing post-dismissal re-indictment, and his personal authorization—as the office's sole administrative gatekeeper—to proceed with re-indictment notwithstanding a judicial finding of legal insufficiency.

164. This claim falls outside the "narrow exception" recognized in *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022), under which a New York district attorney's decision "whether, and on what charges, to prosecute" is treated as state action for *Monell* purposes. Plaintiff does not challenge the bare prosecutorial choice to charge a particular crime; he challenges the *administrative* conduct of the County's final policymaker in operating the OCDAO without any office-level approval or review mechanism for post-dismissal re-indictment, and Fitzpatrick's administrative decision—made in his managerial capacity, not as an advocate in any individual case—to authorize re-presentation of charges that had already been judicially dismissed for legal insufficiency. The Second Circuit and this Court have consistently ascribed such administrative DA conduct to the county for *Monell* purposes. *See Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992); *Bellamy v. City of New York*, 914 F.3d 727, 758 (2d Cir. 2019); *Rivas v. Onondaga County*, 2025 WL 2675826, at *17–*19 (N.D.N.Y. Sept. 18, 2025).

165. Because the OCDAO maintained no formal protocol, supervisory review, or written-approval requirement for post-dismissal re-indictment, Fitzpatrick's personal authorization of re-indictment was, by operation of law, the office's policy. Where a final policymaker's individual conduct constitutes the entirety of the office's practice in a given administrative area—because no superseding written rule constrains it—that conduct *is* the policy. *See Rivas*, 2025 WL 2675826, at *18 (holding the County subject to *Monell* liability where

Fitzpatrick's personal disclosure practices, in the absence of formal office protocols, constituted the office's policy).

166.    Upon information and belief, D.A. Fitzpatrick personally made the decision to pursue a second indictment against Mr. Martin in his official capacity as the District Attorney of Onondaga County. As the County's admitted final policymaker for the District Attorney's Office, *see Rivas v. Onondaga County*, 2025 WL 2675826, at *17, *19 (N.D.N.Y. Sept. 18, 2025), Fitzpatrick's decision constituted an act of final policymaking authority that is attributable to Onondaga County as a matter of law. *See Pembaur v. Cincinnati*, 475 U.S. 469, 480–81 (1986) ("municipal liability may be imposed for a single decision by municipal policymakers" where the decisionmaker "possesses final authority to establish municipal policy with respect to the action ordered"); *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).

167.    Fitzpatrick's decision to re-indict Mr. Martin established a de facto policy of Onondaga County: that the OCDAO would pursue re-prosecution of defendants on charges previously dismissed by a court for legal insufficiency, even in the absence of any new evidence curing the specific deficiencies identified in the dismissal order. This policy was the moving force behind the deprivation of Mr. Martin's constitutional rights. As the *Rivas* court recognized, "the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*." *Rivas*, 2025 WL 2675826, at *18 (quoting *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022)).

168.    As a direct and proximate result of this County policy, Mr. Martin was re-indicted and incarcerated for approximately five additional months on charges that Judge Doherty again found to be legally insufficient. The second indictment, prosecution, and incarceration of Mr. Martin on charges unsupported by legally sufficient evidence violated his rights under the Fourth

and Fourteenth Amendments to the United States Constitution. Plaintiff therefore asserts *Monell* liability against Onondaga County based on D.A. Fitzpatrick's decision, as the County's final policymaker, to re-prosecute Mr. Martin on legally insufficient charges, and seeks compensatory damages and such other relief as the Court deems just and proper.

**STATE LAW CLAIMS AGAINST THE DEFENDANT OFFICERS AND THE CITY OF SYRACUSE**

**TWELFTH CLAIM FOR RELIEF**

**MALICIOUS PROSECUTION UNDER NEW YORK LAW**

**(AGAINST THE DEFENDANT OFFICERS AND THE CITY OF SYRACUSE)**

169.    All preceding and subsequent paragraphs are incorporated by reference.

170.    On January 15, 2025, within ninety days of his November 21, 2024 release from custody, Plaintiff served a Notice of Claim upon Defendant CITY by certified mail, return receipt requested, directed to the Corporation Counsel of the City of Syracuse, pursuant to New York General Municipal Law § 50-e. That Notice of Claim gave the CITY early notice of, among other things, claims for malicious prosecution, violations of Plaintiff's rights under the New York State Constitution, and respondeat superior liability against the CITY arising from the June 6, 2024 arrest and the second prosecution, which at that time remained pending on the People's appeal.

171.    On February 19, 2025, the CITY served a demand for examination pursuant to General Municipal Law § 50-h, and on May 8, 2025, Mr. Martin appeared for and testified at the 50-h examination conducted by the Office of the Corporation Counsel of the City of Syracuse.

172.    On March 20, 2026, the criminal proceedings against Mr. Martin terminated finally and in his favor when the Appellate Division, Fourth Department, unanimously affirmed the

46

dismissal of the second indictment. The People did not seek leave to appeal to the New York Court of Appeals.

173. On or about April 2, 2026, within ninety days of that accrual, Plaintiff served a second Notice of Claim upon Defendant CITY pursuant to General Municipal Law § 50-e, asserting claims for malicious prosecution and for violations of his due process rights under the New York State Constitution arising from the second prosecution and its favorable termination. The state-law claims Plaintiff asserts in this action are the claims timely noticed in that second Notice of Claim.

174. At least thirty days have elapsed since service of each Notice of Claim, and the CITY has neglected and refused to make any adjustment or payment of the claims. This action is commenced within one year and ninety days after the accrual of the claims asserted in this and the following cause of action, as required by General Municipal Law § 50-i.

175. Defendant Officers, acting within the scope of their employment as police officers, detectives, and employees of the CITY and in furtherance of the CITY's business, initiated and continued criminal proceedings against Mr. Martin: as set forth above, they fabricated and forwarded to the District Attorney's Office false and materially misleading reports and grand jury presentation materials; withheld material exculpatory evidence, including the forensic evidence excluding Mr. Martin from the suspect vehicle; swore out a Felony Complaint containing statements they knew to be false or misleading; and gave false and misleading testimony to the grand jury. By creating false information and forwarding it to prosecutors, withholding the truth, and procuring both indictments, Defendant Officers played an active role in — and importuned and induced — the initiation and continuation of the prosecutions.

176. The criminal proceedings were initiated and continued without probable cause to believe that Mr. Martin had committed any offense: the Onondaga County Court twice held the evidence legally insufficient, and the Appellate Division, Fourth Department, unanimously affirmed.

177. Although an indictment ordinarily gives rise to a presumption of probable cause, that presumption is rebutted here because the indictments were procured by fraud, perjury, the suppression of exculpatory evidence, and other police conduct undertaken in bad faith, as set forth above. *See Colon v. City of New York*, 60 N.Y.2d 78, 82–83 (1983); *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 760–61 (2016).

178. Defendant Officers acted with actual malice: they pursued Mr. Martin notwithstanding the absence of any reliable evidence connecting him to the shooting and in conscious disregard of forensic evidence in their own possession that excluded him; and, after the first indictment was dismissed, they re-packaged the same insufficient evidence under a fabricated gang-motive theory in order to procure the re-indictment of a man on charges a court had already held legally insufficient.

179. The criminal proceedings terminated in Mr. Martin's favor: the first indictment was dismissed for legal insufficiency on April 10, 2024; the second indictment was dismissed for legal insufficiency by Decision and Order dated November 1, 2024; and on March 20, 2026, the Appellate Division, Fourth Department, unanimously affirmed. These dismissals constituted a final termination of the criminal proceedings that was not inconsistent with Mr. Martin's innocence. *See Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195–99 (2000).

180. As a direct and proximate result of the malicious prosecution, Mr. Martin suffered a deprivation of liberty — including post-arraignment detention from June 6, 2024 through

November 21, 2024, and the restraints attendant to a pending murder prosecution through March 20, 2026 — as well as lost employment and income, injury to reputation, and severe mental and emotional distress.

181.    At all relevant times, Defendant Officers acted within the scope of their employment with the CITY and in furtherance of their duties as SPD officers and detectives. Defendant CITY is therefore vicariously liable for the Defendant Officers' tortious conduct under the doctrine of *respondeat superior*.

182.    Defendant Officers' conduct was willful, malicious, oppressive, and reckless, warranting an award of punitive damages against the individual Defendant Officers. Punitive damages are not sought against the CITY. *See Sharapata v. Town of Islip*, 56 N.Y.2d 332, 334 (1982).

## THIRTEENTH CLAIM FOR RELIEF

## DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS OF LAW IN VIOLATION OF ARTICLE I, § 6 OF THE NEW YORK STATE CONSTITUTION

## (AGAINST THE DEFENDANT OFFICERS AND THE CITY OF SYRACUSE)

183.    All preceding and subsequent paragraphs are incorporated by reference.

184.    Article I, § 6 of the New York State Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.

185.    Plaintiff complied with the conditions precedent to suit set forth in General Municipal Law §§ 50-e, 50-h, and 50-i, as alleged above. Both Notices of Claim asserted violations of Plaintiff's rights under the New York State Constitution, including the April 2, 2026 Notice of Claim, which expressly asserted the deprivation of Plaintiff's due process rights arising from the second prosecution; Plaintiff appeared for and testified at a 50-h examination on May 8, 2025; at

49

least thirty days have elapsed since service of each Notice of Claim; and the CITY has neglected and refused to adjust or pay the claims.

186. As set forth above, Defendant Officers, acting under color of state law and within the scope of their employment, fabricated evidence and official documentation, swore to false statements, manufactured a false gang-motive narrative, withheld material exculpatory evidence, and forwarded false and materially misleading materials to prosecutors and the grand jury, causing Mr. Martin to be arrested twice, indicted twice, detained for approximately fifteen months, and subjected to a pending murder prosecution for nearly three years, for crimes he did not commit.

187. By this conduct, Defendant Officers deprived Mr. Martin of his liberty without due process of law, in violation of Article I, § 6 of the New York State Constitution.

188. New York recognizes a cause of action for damages for violations of the New York State Constitution. *See Brown v. State of New York*, 89 N.Y.2d 172, 186–92 (1996). Plaintiff asserts this claim in the alternative, to the extent that his remedies at common law and under 42 U.S.C. § 1983 do not provide complete redress for the deprivation of his rights under the New York State Constitution, including because the CITY is answerable for its employees' violations of the State Constitution without regard to the policy-or-custom requirements that govern Plaintiff's federal claims against the CITY.

189. Defendant CITY is liable for the Defendant Officers' violations of the New York State Constitution under the doctrine of *respondeat superior*.

190. As a direct and proximate result of these violations, Mr. Martin suffered a deprivation of liberty, lost employment and income, injury to reputation, and severe mental and emotional distress, as set forth above.

191.    Defendant Officers' conduct was willful, malicious, oppressive, and reckless, warranting an award of punitive damages against the individual Defendant Officers. Punitive damages are not sought against the CITY.

**WHEREFORE and in light of the foregoing**, Plaintiff respectfully requests that the Court assume jurisdiction and:

[a] Invoke supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

[b] Award appropriate compensatory damages;

[c] Award appropriate punitive damages;

[d] Award attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988 for the federal constitutional claims and such other statutory authority as the Court deems appropriate;

[e] Award pre-judgment interest as allowed by law;

[f] Empanel a jury.

[g] Award such other and further relief as the Court deems to be in the interest of justice.

[h] Enter a declaratory judgment that Defendants' conduct, as alleged, violated Plaintiff's rights under the Fourth and Fourteenth Amendments and that Defendants are liable under 42 U.S.C. § 1983.

52

Dated: New York, New York
      June 12, 2026

Respectfully Submitted,

By: _____

Elliot D. Shields
Roth & Roth, LLP
Counsel for Plaintiff
192 Lexington Avenue, Suite 802
New York, New York 10016
Phone: (212) 425 1020
Email:eshields@rothandrothlaw.com